## ELLIOTT v. E. C. MILLER & CO.

(Circuit Court, E. D. Pennsylvania. January 27, 1908.)

### No. 74.

1. TRIAL—VERDICT—GENERAL OR SPECIAL VERDICT.

Under the Pennsylvania practice, a special verdict must place on record all the essential facts of the case, disputed or undisputed, upon which facts alone without inferences of further facts the judgment is to be rendered, and where a case is submitted generally the fact that certain disputed questions of fact were also submitted for findings thereon does not render the verdict a special one.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, § 822.

Jury trial in federal court, see notes to O'Connell v. Reed, 5 C. C. A. 603; Vany v. Peirce, 26 C. C. A. 528; Nederland Life Ins. Co. v. Hall, 27 C. C. A. 393.]

2. CORPORATIONS — TRANSFER OF SHARES — INDORSEMENT OF CERTIFICATE IN BLANK—BONA FIDE PURCHASERS.

The owner of a certificate of stock in a corporation who delivers it to brokers for sale, indorsing it in blank, thereby makes it transferable by delivery, and an innocent purchaser of the same for value from the brokers acquires an indefeasible title as against the true owner.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 539–546.]

3. SAME—PURCHASER FOR VALUE.

Plaintiff delivered a certificate of stock in his name to a firm of brokers for sale, indorsing the same in blank. The brokers having an open account with defendants, who were their correspondents, sent such certificate to defendants to be credited generally to their account, and to take the place of certain other stock previously sent to defendants, which at their request defendants transferred to a third person. Defendants had no knowledge that the brokers were not the actual owners of plaintiff's stock. Held, that they were innocent purchasers for value, having surrendered other stock of value in exchange therefor, and that plaintiff was not entitled to recover its value from them in conversion.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 539–546.]

At Law. On motion by defendants for judgment notwithstanding the verdict.

Ruby R. Vale and Whiteman & Woolley, for plaintiff.
G. W. Hart and E. D. McLoughlin, for defendants.

J. B. McPHERSON, District Judge. The plaintiff's counsel is mistaken in supposing that the verdict is what is well known as a special verdict. Such a finding should place on record all the essential facts of the case, disputed or undisputed, and upon these facts alone the judg-

ment of the court is to be rendered. The established rule in Pennsylvania on this subject is thus stated by Mr. Justice Mestrezat in Sewing Machine Co. v. Insurance Co., 201 Pa., on page 647, 51 Atl., at page 354:

"It is the province of a special verdict to find and place on record all the essential facts in the case. This includes the disputed as well as the undisputed facts. What is not found by the verdict is presumed not to exist, and no inferences as to matters of fact are permitted to supply the facts themselves which the verdict should have found. In entering judgment, the court is confined to the facts found by the special verdict, and unless they are sufficiently found no judgment can be entered. The jury must find the facts, and the court declare the law on the facts so found. Such are the requisites of a special verdict as held in all our cases. In Wallingford v. Dunlap, 14 Pa. 33, it is said: 'It is of the very essence of a special verdict that the jury should find the facts on which the court is to pronounce judgment according to law. And the court will not intend anything, especially any fact not found by the jury. * * * The undisputed facts ought to have been incorporated in the special verdict. * * * The court is confined to the facts found by the special verdict. And when a special verdict is given, the court ought to confine its judgment to that verdict. * * * But this special verdict is so defective and erroneous, and the judgment so anomalous in being entered partly on the verdict and partly on what was called undisputed facts, that we must do what has often been done before, reverse the judgment, and send the case back for a new trial.' Mr. Justice Mercur, delivering the opinion of the court in Vansyckel v. Stewart, 77 Pa. 126, says: 'It (special verdict) must include both disputed and undisputed facts. The court will not infer a fact not found by the jury. It must declare the law on these facts alone. As all the essential facts must be found in the verdict, it follows that it cannot be aided by intendment or by extrinsic facts appearing upon the record.' In Trigg v. Treacy, 104 Pa. 498, Clark, J., speaking for the court, says: 'We cannot resort to the testimony, or to such extrinsic matters as were undisputed at the trial, or avail ourselves of such even as appear upon the record. It is of the very essence of a special verdict that the facts found are those upon which the court is to pronounce judgment according to law. What is not thus found is presumed not to exist, the verdict being conclusively the complete result of the jury's deliberation upon the whole case presented.'"

To the same effect is Kelchner v. Nanticoke Borough, 209 Pa. 412, 58 Atl. 851.

In the case now before the court, the jury was not asked to find a special verdict, but simply to answer certain questions, and thus to settle the dispute between the parties concerning the particular facts covered thereby. The method adopted is fully described in Clementson on Special Verdicts, chs. 4 and 5, pp. 44, 57, 68. The verdict is so far from being special that it embraces a general finding in favor of the plaintiff for a definite sum; and, moreover, if the court is now to be confined, as the counsel for the plaintiff apparently insists, to the answers made by the jury to the questions put by the court, no judgment whatever can be entered, because the questions and answers taken by themselves are not intelligible, and, thus taken, do not form a sufficient basis for judgment. This will appear at once by reading at this stage of the discussion the questions and answers that are now part of the verdict:

"(1) Was the certificate pledged by Evans & Co. on November 10 or 11, 1905, in order to protect their general account with Miller & Co.? In other words, was it deposited as collateral security for that purpose? Answer: No.

"(1½) Did Evans & Co. intend to pledge this stock as collateral security for a debt to Miller & Co. existing on November 10th or 11th, or did they intend

it to be credited generally to their account? Answer: To be credited generally to their account.

"(2) Was the certificate in question intended to take the place, and did it take the place, of the 30 shares of U. G. Imp. Co. referred to in the letter of November 10th? Answer: Yes.

"(3) On November 10th or 11th, or at any time afterward, before the stock in question was sold, did Evans & Co. direct Miller & Co. to hold this stock, and not to sell it until it should reach either 51½ or 52½? Answer: No."

It is, I think, perfectly plain that these questions and answers do not constitute, and were never intended to constitute, a special verdict, but were simply intended to resolve certain disputes of fact which the jury was asked by the court to settle specifically by this method. An examination of the charge will show distinctly what was done. Nearly all the facts were undisputed, but some were controverted, and there was a controversy also concerning the propriety of drawing certain inferences of fact. It was these controversies only that were covered by the questions that the jury were asked to answer, and the result of the verdict (taken as a whole) is, therefore, to decide all the disputes of fact, and thus to leave the court to consider the reserved questions of law, upon the facts about which there was no contention at the trial, and also upon the facts that were then in contest, but have now been conclusively found by the jury's answers to the questions put by the court.

The undisputed facts were as follows: The plaintiff, on November 10, 1905, was the owner of 50 shares of preferred stock in the Philadelphia Company, and on that day he delivered the certificate to H. L. Evans & Co., a firm of brokers then doing business in Wilmington, Del. He directed them to sell at not less that 51½, and, at the time when the certificate was delivered, he indorsed it in blank, according to the usual course of business. The effect of this indorsement was to make the certificate transferable by mere delivery, and therefore to enable the brokers to deal with the plaintiff's stock precisely as if it were their own. Among other acts, they had the power to sell or pledge the certificate for their own benefit to any other person and at any price whatever. They were the apparent owners, having been clothed with all the indicia of title by the real owner, and beyond question were able to make a formal transfer of the stock that was prima facie valid; and if their vendee or pledgee acted in good faith without notice of the facts, and gave a valuable consideration for the stock, the transfer would give him an indefeasible title, even against the plaintiff, who continued of course to be the true owner. This well-known rule rests upon the principle that, of two innocent persons, namely, the owner and his agent's vendee or pledgee, one of whom must suffer by the agent's wrongdoing, the owner must bear the loss, because by his own incautious act—the delivery of the certificate indorsed in blank—he has enabled his agent to do the wrong, and to get money or valuable property from an innocent third person by the use of this apparently perfect title.

The defendants, who were brokers in Philadelphia and the correspondents of Evans & Co., claim to be innocent holders for value, and the defense must stand or fall by the truth or falsity of this claim. Upon this point, it appeared that Evans & Co. had a running account with

the defendants, and on October 10, 1905, sent the stock in question with the following letter:

"Gentlemen: For the credit of our account, we hand you herewith inclosed certificate No. L 2260 for 50 shares Philadelphia Company preferred, in the name of Isaac C. Elliott. Kindly have put in name of Eugene DuPont, of this city, 30 shares United Gas Improvement, and forward certificate to us when ready."

The account kept by Evans & Co. with the defendants was a general account, into which was put all purchases and sales of stock and other securities. The account was credited with whatever cash was sent by Evans & Co. or was advanced by the defendants, and was credited also with the securities sent by Evans & Co., although these securities would only be sold upon their order; and the account was charged with the purchase price of such securities as were bought in accordance with their direction. The defendants had no notice from any source that the stock in question was in reality the plaintiff's property. In February, 1906, Evans & Co. failed, being then indebted to the defendants, on account of their mutual dealings, and the stock (with other securities) was sold under the rules of the Philadelphia Stock Exchange, bringing 49⅝ in the open market. The proceeds of the sale went in part to the credit of the general account of Evans & Co., and the remainder was paid to their trustee in bankruptcy. This sale and credit constitute the wrongful conversion charged by the plaintiff, and the suit is brought to recover the money thus realized by the defendants.

All the foregoing facts were undisputed. The disputed questions were these: (a) Did Evans & Co. direct the defendants to hold the stock in question, and not to sell it until it should reach at least 51½? The jury has found that no such direction was given. (b) For what purpose was the stock sent to the defendants? Was it pledged as collateral security to protect the general account of Evans & Co.? Was it pledged for a debt due to the defendants on November 10th or 11th? Or was it sent to be credited generally to Evans & Co's. account? These questions the jury have answered by finding that the stock was not pledged to protect the general account, or as collateral security for a debt existing on November 10th or 11th; but that it was sent to the defendants to be credited generally to the account of Evans & Co.—that is, that the shares were to be credited as if they had been so much cash paid in on account, although the precise sum could not be ascertained until the stock should be sold. (c) But there was a further important fact in dispute that needed decision. The defendants alleged that the shares in question were sent to take the place of certain shares of United Gas Improvement Co.'s stock, which the defendants had previously received from Evans & Co., and had already credited upon the general account. These shares were now to be turned over to another person, Eugene DuPont, and the Philadelphia Company shares were to be substituted therefor. This allegation the jury has also found to be true, as indeed there could be little question in view of the instruction contained in the letter of November 10th—"Kindly have put in the name of Eugene DuPont of this city, 30 shares of United Gas Improvement Co. stock, and forward certificate to us when ready."

It will thus be seen, I think, that the legal question is very narrow. It is not denied that, if the facts before the court show the defendants to be innocent holders for value of the certificate in dispute, the plaintiff cannot recover. It is also not denied that they are innocent holders, since they had no actual notice, and were not put upon inquiry, concerning the validity of the apparently perfect title with which the plaintiff had clothed Evans & Co. on November 10th. If they were also "holders for value," their title was indefeasible, and this, then, is the narrow point to be determined. As I regard it, there is not much room for discussion. The jury has found distinctly that the stock was not pledged as collateral, either to protect generally the account of Evans & Co., or as security for the particular balance that they may have owed on November 10th or 11th; but that it was sent to the defendants to be credited generally, taking the place for this purpose of 30 shares in another corporation, these shares being thereupon surrendered by the defendants and delivered to Evans & Co. in accordance with the letter of November 10th for the benefit of a third person. Upon these facts, I think the defendants were clearly holders for value. They gave a valuable consideration for the shares in question, because they had in their hands on November 11th a piece of valuable property to the benefit of which they were entitled, and at the request of Evans & Co. they exchanged this property for shares in another company to which Evans & Co. had an apparently perfect title. Having thus parted with a thing of value, in consideration of receiving another thing of value in its place, the transaction is an executed contract upon lawful and sufficient consideration, and in my opinion, therefore, the defendants are "holders for value" of the stock in dispute. It seems hardly necessary to support this conclusion by reference to authorities, but citation may be made in the cases appearing in 6 Amer. & Eng. Ency. Law (2d Ed.) 738, note 5; 23 Amer. & Eng. Ency. Law (2d Ed.) 489, par. (7), notes 2 and 3; and 1 Page, Contracts, § 274. The defendants changed their position and gave up something of value to them on the strength of the shares they received in exchange—to use the language of Shufeldt v. Pease, 16 Wis. 660—and the transaction therefore discloses both a benefit to the promisor, and a detriment to the promisee; either of these elements being sufficient to constitute a valuable consideration.

Judgment will be entered in favor of the defendants notwithstanding the verdict.